**Robert A. BUCHAN, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 92–505 C.

United States Court of Federal Claims.

June 10, 1994.

Ed Bethune, Searcy, AR, for plaintiffs.

Anthony J. Ciccone, U.S. Dept. of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

HODGES, Judge.

Plaintiffs Robert A. Buchan and 25 other Federal Bureau of Investigation Agents bring this suit to recover back pay for overtime worked from November 29 through December 4, 1987. Plaintiffs allege that Special Agent in Charge Weldon Kennedy officially ordered overtime and that they are entitled to compensation for general overtime. 5 U.S.C. § 5542(a) (1988). Defendant contends that the FBI position is compensated with annual premium pay because it is administratively uncontrollable, and subject to irregular and unscheduled overtime. 5 U.S.C. § 5545(c)(2) (1988). We conclude that the plaintiffs are entitled to general overtime pay if on the last day to schedule the plaintiffs' administrative workweek, it was reasonable to predict they would be required to work twelve-hour shifts for seven successive days. This raises a factual issue, so we must deny both motions for summary judgment.

### FACTS

On November 23, 1987, the Atlanta penitentiary warden informed FBI Special Agent in Charge Weldon Kennedy that approximately 1400 Cuban detainees of the Mariel boat lift were rioting. They had taken several civilian hostages. Special Agent Kennedy requested that FBI Headquarters assign all available agents to assist in quelling the prison riot. Headquarters granted this request, and agents began arriving within a few hours. Plaintiffs are members of the Chicago Special Weapons and Tactical forces; they arrived shortly after midnight on Tuesday.

The emergent nature of the situation initially required the plaintiffs to spend extensive time at assigned duty stations. The event was stabilized by Thursday morning, but Special Agent Kennedy realized that the riot was not going to end in the immediate future. To facilitate the smooth operation of the SWAT teams, Kennedy split the agents

into an "A.M. Shift," which was assigned to the prison from midnight to noon, and the "P.M. Shift," from noon to midnight. All holidays and vacations for the agents involved were canceled. These orders remained in effect until the end of the emergency.

Plaintiffs allege that by Saturday the FBI knew that the emergency would last well into the next week, if not beyond. Defendant contends that the number of days the shifts would be necessary was unpredictable due to the nature of a riot. Neither party has shown whether it was reasonable to expect the event to last at least seven days.

The shifts continued from November 26 until the Cubans surrendered on December 4. After the surrender, plaintiffs worked eight-hour shifts through December 6 to secure the prison. Ten agents worked nine twelve-hour shifts at the prison and sixteen agents worked eight twelve-hour shifts at the prison.

During the assignment, the agents asked for and received Special Agent Kennedy's approval to request overtime from Headquarters. FBI Headquarters denied plaintiffs' request because it viewed emergencies as administratively uncontrollable, and FBI agents receive annual premium pay for such work. Defendant gives no other explanation of why FBI Headquarters did not schedule the anticipated overtime.

Plaintiffs appealed to the General Accounting Office, which also denied the request for overtime, then filed a complaint in this court pursuant to 28 U.S.C. § 1491(a) (1988). We heard arguments on cross-motions for summary judgment on May 16, 1994.

## DISCUSSION

Plaintiffs claim that the overtime hours were officially ordered and therefore "regularly scheduled." Regularly scheduled overtime hours are compensated as general overtime at one and one-half times the hourly rate of the employee's basic pay. 5 U.S.C. § 5542(a); 5 C.F.R. § 510.103(g) (1987). Defendant contends that the overtime hours were not capable of being scheduled because they were administratively uncontrollable.

Because the overtime was "unscheduled," the FBI properly compensated the agents with annual premium pay. 5 U.S.C. § 5545(c)(2); 5 C.F.R. § 550.103(f) (1987). We cannot find support for either of these conclusions.

■ Congress authorized overtime pay pursuant to 5 U.S.C. §§ 5542, 5545. Section 5542(a) authorizes compensation for general overtime *officially ordered or approved* at time and one-half pay. 5 U.S.C. § 5542(a). If overtime hours cannot be controlled administratively, an employee receives annual premium pay pursuant to 5 U.S.C. § 5545(c)(2). An employee who receives annual premium pay is excluded from all other forms of premium compensation, except for "regularly scheduled overtime, night, and Sunday duty, and holiday duty." 5 U.S.C. § 5545(c)(2). Thus, a position compensated with annual premium pay cannot receive general overtime unless the overtime is officially ordered or approved, and scheduled.

■ Congress delegated to OPM the authority to promulgate regulations for the administration of premium pay. 5 U.S.C. § 5548 (1988). The relevant regulations are set out below.

Irregular or occasional overtime work means overtime work that *is not part* of an employee's regularly scheduled administrative workweek. 5 C.F.R. § 550.103(f) (1987) (emphasis added).

Regular overtime work means overtime work that *is part* of an employee's regularly scheduled administrative workweek. 5 C.F.R. § 550.103(g) (1987) (emphasis added).

Overtime work ... includes irregular or occasional overtime work and regular overtime work. 5 C.F.R. § 550.103(h) (1987).

Regularly scheduled administrative workweek ... means the period within the administrative workweek, established in accordance with 5 C.F.R. § 610.111 of this chapter, within which the employee is regularly scheduled to work. 5 C.F.R. § 550.-103(n) (1987).

[O]vertime work means work in excess of 8 hours in a day or in excess of 40 hours in an administrative workweek that is official-

ly ordered or approved. 5 C.F.R. § 550.-111(a) (1987).

The head of each agency ... shall establish by regulation: (1) A basic workweek of 40 hours which does not extend over more than 6 of any 7 consecutive days. (2) A regularly scheduled administrative workweek that consists of the 40–hour basic workweek established in accordance with paragraph (a)(1) of this section, plus the period of regular overtime work, if any, required of each employee. 5 C.F.R. § 610.111(a) (1987).

(1) The head of an agency shall schedule the work of his or her employees to accomplish the mission of the agency. The head of an agency shall schedule an employee's regularly scheduled administrative workweek so that it corresponds with the employee's actual work requirements. (2) When the head of an agency knows in advance of an administrative workweek that the specific days and/or hours of a day actually required of an employee in that administrative workweek will differ from those required in the current administrative workweek, he or she shall reschedule the employee's regularly scheduled administrative workweek to correspond with those specific days and hours. (3) *If it is determined that the head of an agency should have scheduled a period of work as part of the employee's regularly scheduled administrative workweek and failed to do so in accordance with paragraphs (b)(1) and (2) of this section, the employee shall be entitled to payment of premium pay* for the period of work as regularly scheduled work[.] ... 5 C.F.R. § 610.121(b) (1987) (emphasis added).

The first issue we are to address is whether the job position at issue is subject to substantial amounts of irregular or unscheduled overtime that cannot be controlled through administrative procedures. *Burich v. United States,* 366 F.2d 984, 987, 177 Ct.Cl. 139 (1966), *cert. denied,* 389 U.S. 885, 88 S.Ct. 152, 19 L.Ed.2d 182, *reh'g denied,* 389 U.S. 998, 88 S.Ct. 486, 19 L.Ed.2d 504 (1967). If the position is not subject to substantial amounts of irregular or unscheduled overtime, or the overtime can be controlled

through administrative procedures, then the employee receives general overtime pursuant to 5 U.S.C. § 5542(a). Plaintiffs agree that the FBI position involves a substantial amount of irregular or unscheduled overtime which is administratively uncontrollable, so we do not address that question. We assume FBI compensation for overtime pursuant to 5 U.S.C. § 5545(c) is proper.

If the job position is administratively uncontrollable, then the question is whether the particular *function* of the job is administratively controllable. *Slugocki v. United States,* 816 F.2d 1572, 1576 (Fed.Cir.), *cert. denied,* 484 U.S. 976, 108 S.Ct. 486, 98 L.Ed.2d 484 (1987). In other words, could the overtime necessary to perform this particular function of the job be eliminated through administrative procedures, or could the amount of overtime necessary for that function be regulated. *Fox v. United States,* 416 F.Supp. 593, 597, 598 (E.D.Va.1976).

If the overtime necessary for the particular function could be regulated, overtime is compensated as general overtime pursuant to 5 U.S.C. § 5542(a). Plaintiffs do not contend that responding to a prison riot could be controlled through administrative procedures such as hiring more staff. It would be unrealistic for the FBI to staff enough agents to permit response to all emergency situations without incurring overtime. We agree that responding to a prison riot is administratively uncontrollable. In any event, because overtime can be anticipated and predicted does not necessarily mean the overtime is controllable. *Sullivan v. United States,* 665 F.2d 1012, 1015 (1981).

Once it is determined that both the job and the function within the job entail administratively uncontrollable overtime, the third question is whether the hours were scheduled into the employee's regular administrative workweek. This is the *Anderson* test.

In *Anderson v. United States,* a supervisor required several Veterans Administration employees to work overtime hours regularly. Even though the employees performed the overtime regularly, the directing official did not have the authority to schedule general overtime as part of the employee's regular administrative workweek. The supervisor

could order only irregular overtime, which is compensated with annual premium pay pursuant to 5 U.S.C. § 5545(c)(2). *Anderson v. United States*, 201 Ct.Cl. 660, 665, 1973 WL 21343 (1973).

Here, applicable FBI regulations provide that only FBI Headquarters may authorize general overtime. *FBI Manual of Administrative Operations and Procedure* (*MAOP*) section 8–2.1 (1/27/88). Special Agent Kennedy could authorize only irregular overtime. 5 C.F.R. § 550.103(h). Therefore, the overtime ordered by Kennedy during the prison riot was compensated with annual premium pay pursuant to 5 U.S.C. § 5545(c)(2) because it was not scheduled officially by FBI Headquarters.

That FBI Headquarters did not authorize general overtime is undisputed. Thus, the final question is whether FBI Headquarters should have scheduled the overtime as part of the employee's regular administrative workweek. *Bennett v. United States*, 4 Cl. Ct. 330, 340–43 (1984) (citing *Aviles v. United States*, 151 Ct.Cl. 1, 1960 WL 8530 (1960)).

The fact that overtime is not scheduled may not be sufficient to deny a claim for premium pay if the work is habitual and routine. In *Aviles*, the government would not schedule overtime because it was difficult to estimate, and because the assignments might end earlier than scheduled. The court ruled that the overtime should have been scheduled into the employees' regular administrative workweek, and it treated the work as scheduled. "The defendant could have formally scheduled workweeks or tours of duty which included the overtime which it knew would be required." *Aviles v. United States*, 151 Ct.Cl. 1, 8, 1960 WL 8530 (1960). OPM guidelines reflect this decision in 5 C.F.R. § 610.121(3).

We must look to the agency's implementing guidelines to determine if *not* scheduling the overtime was a violation of law or regulation. *Sullivan*, 665 F.2d at 1014. Sullivan was a Secret Service Agent designated to protect the Secretary of the Treasury on a visit to New York City. To qualify for general overtime, Secret Service guidelines required that the work be scheduled in advance, for more than eight hours a day, and

for a minimum of two consecutive days. Because Sullivan's duty was scheduled for only one day, he was properly compensated with annual premium pay.

FBI guidelines allow general overtime only if authorized in advance by FBI Headquarters and scheduled to recur on at least seven successive days. *MAOP* 8–2.1 at 97. According to defendant, if the FBI does not know with certainty the number of days and hours that specific agents will be working, then FBI Headquarters cannot schedule the overtime. This argument is not supported by either the *Aviles* test or OPM's interpretation of its regulations.

OPM has adopted the following construction of the *Aviles* test: "If an agency fails to schedule its employees in a manner that realistically reflects the agency's actual work requirements, the failure to schedule will constitute a violation …" 48 Fed.Reg. 3931, 3932 (1983). Therefore, if FBI Headquarters reasonably could have predicted on November 28 that the twelve-hour shifts would last a full seven days, it should have scheduled the overtime as part of the agents' regular administrative workweek.

The available documentation does not show what FBI Headquarters thought on the last day to schedule the administrative workweek. We know only that the request for general overtime was denied because plaintiffs were receiving annual premium pay and because FBI Headquarters considered the riot to be administratively uncontrollable. 71 Comp.Gen. 31, 32 (1991). Because these are necessary but not sufficient reasons to deny general overtime, we cannot grant summary judgment for either party.

## CONCLUSION

Defendant's motion for summary judgment is DENIED. Plaintiffs' motion for summary judgment is DENIED. The issue for trial is whether FBI Headquarters reasonably could have scheduled twelve-hour shifts during the week November 29 to December 6, 1987. Counsel will submit a proposed pretrial schedule on or before June 24. Discovery

should be limited, so we expect to try this case within 90 days.